**Richard Alexander WILLIAMS,**
Plaintiff,

v.

**FIRST ADVANTAGE LNS SCREENING SOLUTIONS, INC., f/k/a a LexisNexis Screening Solutions, Inc., Defendant.**

Case No. 1:13cv222–MW/GRJ

United States District Court,
N.D. Florida,
**Gainesville Division.**

Signed October 14, 2015

Barry Seth Balmuth, Barry S. Balmuth PA, West Palm Beach, FL, Michael Owen Massey, Massey & Duffy PLLC, Gainesville, FL, for Plaintiff.

Frederick Thomas Smith, Megan Hall Poonolly, Seyfarth Shaw LLP, Atlanta, GA, Joseph S. Turner, Seyfarth Shaw LLP, Chicago, IL, Leonard J. Dietzen, Rumberger Kirk & Caldwell PA, Tallahassee, FL, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART CROSS–MOTIONS FOR SUMMARY JUDGMENT

Mark E. Walker, United States District Judge

Is Richard Williams incredibly unlucky, or is First Advantage LNS Screening Solutions not very good at performing public records searches on individuals with common names? This case concerns a pair of inaccurate background reports that may have cost Plaintiff Richard Alexander Williams ("Williams") two different jobs. Williams claims that Defendant First Advantage LNS Screening Solutions, Inc. ("First Advantage")—a credit reporting agency ("CRA") that contracts with employers to provide a variety of background reports on potential employees—mistakenly reported criminal records for a different person, Ricky Williams, on two separate occasions, leading two different employers to deny him employment. ECF No. 71, at 1–2. Williams originally brought suit against the two employers, Rent–A–Center East, Inc. ("Rent–A–Center") and Winn–Dixie Stores, Inc. ("Winn–Dixie"), in addition to First Advantage, but later voluntarily dismissed his claims against them. ECF Nos. 41, 43. His claims against First Advantage are brought under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq.

Each party has filed a motion for summary judgment, ECF No. 69 (Defendant's Motion for Summary Judgment); ECF No. 71 (Plaintiff's Motion for Summary Judgment), and responses in opposition thereto, ECF No. 72 (Defendant's Opposition); ECF No. 73 (Plaintiff's Opposition). For the reasons set forth below, this Court grants in part and denies in part Defendant's Motion for Summary Judgment and denies Plaintiff's Motion for Summary Judgment.

## STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A dispute is "genuine" if the record is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Material" facts are those that might affect the outcome of the case under the governing substantive law. Id.

While this Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "[i]nferences based upon speculation are not reasonable," Solliday v. Fed. Officers, 413 Fed.Appx. 206, 207 (11th Cir. 2011). Failure by the nonmoving party to prove an essential element of its case, for which it has the burden of proof at trial, entitles the moving party to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## DISCUSSION

### I. BACKGROUND

Williams applied for a job at a Rent–A–Center store in Chiefland, Florida in February of 2012. ECF No. 70–8, at 11. As part of the application process, Williams

had to agree to submit to a background check. *Id.* Rent–A–Center had a contract with Lexis Nexis Screening Solutions, Inc. ("Lexis Nexis")—since acquired by First Advantage, ECF No. 71–1, at 1–2—to perform such background checks and to conduct "adjudications" on job applicants. *Id.* at 4.

First Advantage—in reality, Lexis Nexis, but for the sake of clarity this Court will refer to both entities as First Advantage—performed a background check on Williams. *Id.* As part of its background check, First Advantage searched a database of criminal records that it maintains called the National Criminal File ("NCrF"). ECF No. 70–2, at 9, 14. First Advantage "matched" Williams with a number of criminal records from Palm Beach County, Florida based on his name,[1] date of birth, state of residence, and sex. *Id.* at 14; ECF No. 70–4, at 9. First Advantage "confirmed" the match by performing additional research of online court records in Palm Beach County; the confirmation, however, did not involve the matching of any additional identifiers, such as Social Security number or address. ECF No. 70–4, at 8–9. First Advantage only included two of these records in its report to Rent–A–Center, as the remainder were older than seven years. *Id.* at 10. The two records it did include concerned the 2009 arrest and subsequent issuance of a bench warrant for a "Ricky

Williams" ("Ricky 1") for selling cocaine in Palm Beach County. ECF No. 71–19, at 4.

First Advantage then "adjudicated" Williams's application—that is, it considered the information compiled on Williams and, using criteria set out by Rent–A–Center, made a determination of whether to label Williams as "ineligible" for the position to which he had applied. ECF No. 70–2, at 5–6, 14. Williams was adjudicated ineligible based on the criminal records for Ricky 1. *Id.* at 14.

On February 28, 2012, First Advantage sent the background report on Williams (including the adjudication result) to Rent–A–Center electronically. ECF No. 71–1, at 5. At around that time,[2] First Advantage sent two notices to Williams via U.S. Mail: a notice that it was reporting public record information to Rent–A–Center, ECF No. 71–12, and a notice (sent on behalf of Rent–A–Center) that it might not hire Williams based on information in his background report, ECF No. 71–11.[3] Williams received these notices at the same time in March, ECF No. 70–8, at 13.

Upon receiving the notices,[4] Williams contacted Rent–A–Center, who referred him to First Advantage. ECF No. 70–8, at 12. First Advantage then reinvestigated the background report. ECF No. 70–4, at 11. As part of its reinvestigation, First Advantage obtained hard copies of the

---

1. First Advantage's system allows for matches when first names are similar but not identical, which is how "Richard" was matched with "Ricky." ECF No. 70–4, at 9.

2. There is a dispute as to when First Advantage sent the notices. First Advantage claims it sent the notices on February 28, 2012, ECF No. 70–1, at 3–4, whereas Williams claims the notices were sent out two days later, on March 1, 2012, ECF No. 71, at 8; ECF No. 71–23.

3. This is known as a "pre-adverse action notice."

4. There is some inconsistency in the record as to this point. Williams stated at his deposition that he initiated the dispute process after receiving the notices, ECF No. 70–8, at 12, but he also maintains that he initiated the dispute process on March 1, 2012, ECF No. 71–1, at 10; ECF No. 71, at 13. It is difficult to reconcile these two facts with Williams's claim that the notices were postmarked March 1, 2012.

court records pertaining to Ricky 1's arrest; because First Advantage could "not match another identifier" in those records to Williams, the records were removed from his file. ECF No. 70–6, at 3. First Advantage's reinvestigation was completed on March 12, 2012, *id.* and Williams was sent notice that his background report had been revised, together with a copy of the revised report, on March 14, ECF No. 70–8, at 14. Unfortunately, it appears it was too late for Williams: after receiving the revised report, Williams was told by Rent–A–Center that it had already hired someone else for the position. *Id.* at 15.

Lexis Nexis became part of First Advantage in early 2013, ECF No. 71–1, at 1–2, but the change of corporate identity did not improve its accuracy rate with respect to Williams. In a turn of events that understandably caused Williams to ask "[h]ow is this coming up once again?" ECF No. 70–8, at 19, First Advantage matched Williams with *different* criminal records for a Ricky Williams[5] ("Ricky 2") while compiling a background report in connection with Williams's April 2013 application for a position at a Winn–Dixie in Gainesville, *id.* at 16–18. This time the records related to·a burglary and an aggravated battery on a pregnant woman that took place in Broward County, Florida in 2002. ECF No. 71–16, at 6. First Advantage again matched these records to Williams using a search of the NCrF based on his name and date of birth, ECF No. 70–4, at 16–17, but it did not follow up with an online search of court records from Broward County, *id.* at 17; instead, First Advantage conducted a supplemental search using the Florida Department of Corrections ("FDOC") website that "confirmed" the match between Williams and Ricky 2, ECF No. 70–3, at 3. Once again, the confirmation did not involve matching any identifiers besides Williams's name and date of birth with the criminal records. *Id.*

First Advantage, using criteria prescribed by Winn–Dixie, adjudicated Williams as ineligible for the position to which he had applied. ECF No. 70–2, at 21. First Advantage then sent the background report (including the adjudication result) to Winn–Dixie electronically on April 25, 2013, ECF No. 71–1, at 13–14, and–at around the same time,[6] but via U.S. Mail–sent Williams a pre-adverse action notice on behalf of Winn–Dixie and another notice that it was reporting public record information, ECF Nos. 71–16, 71–17.

Williams again disputed the criminal records in the report, ECF No. 70–8, at 18–19, and First Advantage again reinvestigated, ECF No. 70–6, at 4. After obtaining the court records relating to Ricky 2's crimes, ECF No. 70–7, at 12, First Advantage determined that Ricky 2 had a different Social Security number than Williams, and removed the criminal records from Williams's report, ECF No. 70–6, at 4. Williams was sent a revised background report on May 28, 2013. Again, however, it appears that it was too late—Williams

---

5. There is evidence in the record that Ricky 1 and Ricky 2 are, in fact, the same person. ECF No. 73, at 23; ECF No. 73–22. Because the question of whether they are the same person is irrelevant to the analysis of the legal issues under consideration, this Court will continue to refer to them as Ricky 1 and Ricky 2 for the sake of clarity.

6. There is again a dispute between the parties as to when First Advantage sent the notices. Williams insists that the envelopes were postmarked two business days after First Advantage sent the background report electronically to Winn–Dixie, ECF No. 71, at 14; ECF No. 71–24, while First Advantage insists it mailed the notices on April 25, 2013, the same day it sent the background report to Winn–Dixie, ECF No. 70–1, at 4.

was informed by the Winn–Dixie store to which he had applied that someone had already been hired for the position.[7] ECF No. 70–8, at 21.

Williams claims that First Advantage's actions in connection with these two background reports violated the FCRA in four ways: first, he claims that First Advantage failed to "follow reasonable procedures to assure maximum possible accuracy of the information" contained in its reports in violation of 15 U.S.C. § 1681e(b) (Count I of the Second Amended Complaint, ECF No. 30); second, he claims that First Advantage reinserted previously deleted information into its report for Winn–Dixie without following proper procedures, thus violating 15 U.S.C. § 1681i(a)(5) (Count II); third, he claims that First Advantage failed to issue pre-adverse action notice to him in a timely fashion in violation of 15 U.S.C. § 1681b(b)(3)(A) (Count III); and fourth, he claims that First Advantage failed to both timely notify him of its reporting of public record information and failed to maintain strict procedures to ensure that such information would be complete and up to date, thus violating 15 U.S.C. § 1681k(a) (Count IV). ECF No. 71, at 23–24. For each of these violations, Williams asserts both a negligent violation claim under 15 U.S.C. § 1681o and a willful violation claim under § 1681n. *Id.* at 24.

Williams seeks summary judgment on both the negligent and willful violation claims for all four counts, but does not seek summary judgment on the issues of causation and damages. *Id.* First Advantage seeks summary judgment on Counts II, III, and IV, and argues that, at the

very least, the willful claims under those counts must fail. ECF No. 69. This Court will first consider the claims brought under Counts II, III, and IV—claims on which both parties have moved for summary judgment—and will finally address Williams's motion for summary judgment as to Count I.

## II. REINSERTION CLAIM (COUNT II)

First Advantage seeks summary judgment on Williams's "reinsertion" claim, which alleges a violation of 15 U.S.C. § 1681i(a)(5). That provision prohibits a CRA that has deleted an item of information from a consumer's file following a dispute to reinsert the information in the file without complying with certain procedures. Williams claims that First Advantage violated this provision when it included information about Ricky 2's criminal records in its Winn–Dixie report after removing information about Ricky 1's criminal records from Williams's file following his disputation of that information. ECF No. 71, at 32. The inclusion of information about Ricky 2's criminal records constituted "reinsertion" of information, according to Williams, because it "implied" the same thing that the inclusion of Ricky 1's criminal records in the Rent–A–Center report did—namely, that Williams "was Ricky Williams with a date of birth of 8/9/1981 who had been accused of a serious crime." *Id.* First Advantage argues that its actions did not constitute reinsertion because § 1681i(a)(5)(B) 3. "applies *only* where the *same* record from the *same* source is reported again, after being deleted as part of a dispute reinvestigation."[8] ECF No. 70, at 13 (emphasis in original).

---

**7.** Williams was eventually hired by Winn–Dixie, but only after he commenced this lawsuit. ECF No. 70–8, at 22.

**8.** Williams alleged violations of both § 1681i(a)(5)(B) and (C) in his Second Amended Complaint. ECF No. 30, at 15. However, the "reinsertion" inquiry is the

First Advantage's construction of § 1681i(a)(5)(B) is almost certainly too narrow. The provision does not speak of reinsertion of *records*, but rather reinsertion of *information*; the key question, then, in assessing liability under this provision is whether a CRA has put back into a consumer's file information—from whatever source and in whatever form—that the consumer previously disputed. If, for instance, a CRA includes an item of information in a report to the effect that a consumer owes $50,000 to a particular bank, and the consumer successfully disputes that information, the CRA may not put information to the effect that the consumer is carrying that *same* debt in a subsequent report, even if the information comes from a different source.[9] *Cf. Spector v. Trans Union LLC*, 301 F.Supp.2d 231, 235–36 (D.Conn.2004) (denying summary judgment to defendant CRA as to reinsertion claim because, even though credit card account was listed as being tied to a different bank than the previously disputed credit card account, "the same account number was involved and [the CRA] was aware of [the old bank's] transfer of its accounts to [the new bank]"). But § 1681i(a)(5)(B) does not sweep as broadly as Williams would like, in that it does not bar the insertion of information in a credit report that may imply some of the same things that previously deleted information also implied.

■ In this case, First Advantage did not reinsert any information in Williams's file or report any such reinserted information to Winn–Dixie. In its report for Rent–A–Center, First Advantage included criminal records relating to Ricky 1's arrest for the sale of cocaine occurring in Palm Beach County in 2009, ECF No. 71–11, whereas First Advantage included criminal records for Ricky 2's conviction for burglary and aggravated battery on a pregnant woman occurring in Broward County in 2002 in its report for Winn–Dixie, ECF No. 71–16. Even if Ricky 1 and Ricky 2 were the same person, the inclusion of entirely different criminal records relating to entirely different crimes in the second report would not constitute the reinsertion of information disputed in the first report; only the insertion of information to the effect that Williams had been arrested for selling cocaine in Palm Beach County in 2009—no matter what database that information was taken from—would have been "reinsertion" of disputed information within the meaning of § 1681i(a)(5)(B).

---

same for both subsections, and so the parties' arguments about the proper construction of § 1681i(a)(5)(B) are applicable with equal force to § 1681i(a)(5)(C).

9. This Court respectfully disagrees with the approach taken by the court in *Okocha v. Trans Union LLC*, No. 08–CV–3107, 2011 WL 2837594 (E.D.N.Y. Mar. 31, 2011). In that case, the plaintiff disputed an $83 debt he owed to one collections agency, leading to the item being deleted from his file; later, after the collections agency sold the debt to another collections agency, the second collections agency reported the debt to the CRA, which included it in the plaintiff's file. 2011 WL 2837594, at *1. The court granted summary judgment to the CRA on the section 1681i(a)(5)(B) claim, holding that the information was not the same because the account numbers were different and the debts were owed to different collections agencies. *Id.* at *8. The court reasoned that "[r]egardless of the set of procedures utilized, it would have been extremely difficult for the Defendants to know that the [second] account was related to the previously deleted ... account." *Id.* This seems to be a conflation of two different issues: (1) whether a reinsertion of information has occurred and (2) whether the reinsertion was the result of negligence. Here we are concerned with the first question, the answer to which does not depend on how difficult it may have been for a CRA to detect the fact that it was reinserting information.

This does not mean that First Advantage's insertion of criminal records for Ricky 2 into its report for Winn–Dixie after having already inserted criminal records for Ricky 1 into its report for Rent–A–Center is irrelevant; it just means that § 1681i(a)(5) is the wrong legal vehicle in which those facts should ride. Section 1681i(a)(5), like many provisions of the FCRA, is aimed towards preventing a very particular type of mischief, not generally towards encouraging accuracy. Section 1681e(b), on the other hand, *does* mandate that CRAs generally use reasonable procedures to assure accuracy, and the fact that First Advantage would include Ricky 2's criminal records in a report on Williams after making a similar error in the past does not speak well for the reasonableness of its procedures, to put it mildly. But First Advantage's actions did not amount to a "reinsertion" of information, and so summary judgment will be granted to First Advantage as to Count II of Williams's Second Amended Complaint.

### III. PRE–ADVERSE ACTION NOTICE CLAIM (COUNT III)

First Advantage also seeks summary judgment on Williams's claim that it violated 15 U.S.C. § 1681b(b)(3)(A). Williams argues that First Advantage violated that provision by failing to issue Williams "pre-adverse action" notice in a timely fashion before adjudicating his applications as "ineligible" and providing background reports on him to Rent–A–Center and Winn–Dixie. Section 1681b(b)(3)(A) mandates that "in using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates a copy of the report . . . and a description in writing of the rights of the consumer." 15 U.S.C. § 1681b(b)(3)(A).

First Advantage argues that (1) § 1681b(b)(3) does not impose obligations upon CRAs and (2) a CRA cannot take any adverse action against a prospective employee within the meaning of § 1681b(b)(3). ECF No. 70, at 16–17. Williams, relying on the text of § 1681b(b)(3) and a number of district court cases, argues that First Advantage can (legally) and has (factually) violated that provision. ECF No. 71, at 32–34.

■ This Court finds as a legal matter than § 1681b(b)(3)(A) does not impose any obligations on CRAs in their capacities as CRAs, but that it might, under some circumstances, impose duties on CRAs acting as agents of employers. Given the undisputed facts on the record, however, First Advantage did not take any adverse action against Williams within the meaning of § 1681b(b)(3)(A) as an agent of either Rent–A–Center or Winn–Dixie.

### A. Applicability of 15 U.S.C. § 1681b(b)(3)(A) to CRAs

First Advantage argues that § 1681b(b) "contains three subsections with separate and independent duties imposed on CRAs and employers." ECF No. 70, at 15. Under this reading of the statute, § 1681b(b)(1) requires a CRA to perform certain procedures before it may "furnish a consumer report for employment purposes," whereas subsections (2) and (3) require the *users* of those reports to comply with certain procedures intended to protect consumers. For support, First Advantage cites to *Obabueki v. IBM Corp.*, 145 F.Supp.2d 371 (S.D.N.Y.2001), *aff'd* 319 F.3d 87 (2d Cir.2003), a case in which the court noted that "each of the subsections [of § 1681b(b)] need not, and does not, prescribe obligations for both [CRAs] and users" and that "[t]he second and

third subsections both affect users." 145 F.Supp.2d at 393.

Williams's argument relies on a different case, *Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 848 F.Supp.2d 532 (E.D.Pa.2012). *Goode* involved plaintiffs who alleged that the defendant CRA had adjudicated them as noncompetitive for certain jobs before sending pre-adverse action notices. 848 F.Supp.2d at 538. The court found that the CRA could violate § 1681b(b)(3)(A) because "[u]nder the FCRA, 'person' means any individual, partnership, corporation, trust, estate, co-operative, association, government or governmental subdivision or agency, or other entity" and thus a CRA—a "person"— "must comply with § 1681b(b)(3)(A)." *Id.* This reasoning has been endorsed by a few other courts, albeit sometimes in dicta. *See, e.g., Mattiaccio v. DHA Grp., Inc.*, 21 F.Supp.3d 15, 22 n. 5 (D.D.C.2014).

This Court respectfully disagrees with the conclusion of those courts that have decided that § 1681b(b)(3) imposes obligations on CRAs *qua* CRAs. While it is true that the provision uses the term "person" and "person" is broadly defined in the FCRA, an examination of the statute *as a whole* strongly suggests that § 1681b(b)(3) is intended to impose obligations only on employers and/or their agents. There are three contextual clues that support this conclusion.

First, § 1681b(b)(3) is entitled "Conditions on *use* for adverse actions," and the

operative language provides that "in *using* a consumer report for employment purposes," a person intending to take adverse action must issue notice. 15 U.S.C. § 1681b(b)(3)(A) (emphasis added). This language implies that the pre-adverse action notice requirement only applies to "users" of credit reports, not all "persons." Since a CRA acting as a CRA cannot also be a "user," it would not be obligated to issue pre-adverse action notices if § 1681b(b)(3) only applied to users.[10]

Courts' treatment of the similarly-worded portions of § 1681m(a) is instructive. That section is entitled "Duties of users taking adverse actions on basis of information contained in consumer reports" and provides that "[i]f any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, the person shall" provide notice of such adverse action. *Id.* § 1681m(a). Although the term "person" is used in the operative language, it seems clear from the title of the subsection that only users are bound to issue adverse action notices, as multiple courts have recognized. *See, e.g., Ross v. FDIC*, 625 F.3d 808, 814 (4th Cir. 2010). Although not all courts have agreed with this interpretation, *see Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 982 (7th Cir.2004) (noting that § 1681m could apply to non-users because of the "any person" language), it seems clear that CRAs *qua* CRAs, at least, are not required to comply with § 1681m,

---

10. There seems to be agreement that an entity cannot simultaneously be a "user" and a CRA *qua* CRA, at least for purposes of section 1681m. *See, e.g., Mattiaccio v. DHA Grp., Inc.*, 21 F.Supp.3d 15, 22 n. 5 (D.D.C.2014). This makes sense: were a CRA also a "user," it would have to comply with section 1681m when sending a background report with negative information to another user. The notice required by that section, however, must contain a statement that "the [CRA] did not make

the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken"— clearly an untrue statement in that context. Because there is no reason to think that § 1681b would provide for a different sort of relationship between users and CRAs *qua* CRAs than § 1681m, this Court finds that a CRA acting as a CRA cannot also be a user for purposes of § 1681b.

that section's use of "person" notwithstanding.

Second, throughout the FCRA, it is users and not CRAs *qua* CRAs that take "adverse actions." Users (and not CRAs) must issue adverse action notices that include a statement that "the [CRA] did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken" 15 U.S.C. § 1681m(a)(3)(B); *see also id.* § 1681b(b)(3)(B)–(C) (adverse action notice requirements for certain jobs in the trucking industry). Section 1681e(c) provides that a CRA "may not prohibit a user of a consumer report furnished by the [CRA] from disclosing the contents of the report to the consumer, if adverse action against the consumer has been taken by the user." Furthermore, CRAs must, under certain circumstances, give notice to consumers that they are including items in a consumer report that "are *likely* to have an adverse effect upon a consumer's ability to obtain employment," *id.* § 1681k(a) (emphasis added)—suggesting that the information will have an adverse effect only if a user later takes adverse action based on the information, and that the CRA itself cannot take the adverse action.

These provisions reinforce the idea that the entire structure of the FCRA contemplates CRAs providing information to other entities who then may use that information to take adverse actions against consumers. The very definition of "consumer report" in the FCRA supports this reading: a "consumer report" is defined as "any written, oral, or other *communication* of any information *by* a [CRA] . . .

which is used or expected to be used or collected" for certain purposes. *Id.* § 1681a(d)(1) (emphasis added). Implicit in that definition is the notion that a CRA will send a report to someone else who will take action. It would be odd to read § 1681b(b)(3)(A) as the one provision of the FCRA that contemplates CRAs *qua* CRAs taking adverse action when the rest of the statute does not allow for such a thing.

Third, reading § 1681b(b)(3)(A) as Williams urges would have the effect of requiring multiple entities to issue pre-adverse action notices during the evaluation of an employment application. In the simplest case, a CRA would have to issue a § 1681b(b)(3)(A) notice before sending a report on to a potential employer, and the employer would then have to issue a similar notice if they decided not to hire the applicant. Although the FCRA is certainly a law intended to protect consumers, it seems unlikely that Congress would have had such redundancy in mind. *Cf. Weidman v. Fed. Home Loan Mortg. Corp.*, 338 F.Supp.2d 571, 577 (E.D.Pa.2004) (holding that an agent for a lender did not need to comply with the adverse action notice requirements of § 1681m in part because "consumers already receive notice of any adverse credit decision taken by a principal/lender, [and] it would be duplicative to impose a similar burden on an agent providing evaluative assistance at the principal's request").

These structural and textual clues are further supported by the Federal Trade Commission ("FTC") staff report on the FCRA issued in July of 2011.[11] That re-

---

11. The FTC Staff Report does not have the force of law, but it is nonetheless "entitled to respect . . . to the extent [it has] the power to persuade." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). In this case, the FTC Staff Report is persuasive because (1) it was prepared by the agency that has played a large part in implementing and enforcing the FCRA for over 40 years and (2) it appears to recognize—with a

port states that "an *employer* intending to take adverse action shall, before taking such action, provide the consumer a copy of his or her consumer report and a summary" of rights under the FCRA. Fed. Trade Comm'n, 40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations 52 (2011) (emphasis added).[12] The FTC Staff Report repeatedly refers to "employers" when discussing the type of entity that has to comply with the pre-adverse action notice requirement, and repeatedly discusses CRAs separately from employers. *See id.* at 52–53 ("The CRA is responsible for sending the summary of consumer rights to employers. The employer must supply the summary to consumers before taking any adverse action based on a consumer report.").

All of this leads to the following conclusion: CRAs like First Advantage need not send pre-adverse action notices for actions taken in their capacities as CRAs—sending consumer reports to employers, collecting information about consumers, etc. While it is certainly true that a CRA is, under a naïve reading of § 1681a, a "person," it is also true that "oftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.'" *King v. Burwell,* —— U.S. ——, 135 S.Ct. 2480, 2489, 192 L.Ed.2d 483 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)). Placed in the larger context of § 1681b–and in the even larger context of the FCRA—the term "person" in § 1681b(b)(3)(A) does not refer to a CRA *qua* CRA.

This does not end the analysis. While the structure of the FCRA leads to the conclusion that § 1681b(b)(3)(A) does not apply against CRAs acting as CRAs, it does not follow that an entity such as First Advantage that performs some arguably "user-like" functions—such as adjudications—in addition to being a CRA cannot violate § 1681b(b)(3)(A). In particular, a CRA that performs a screening function on behalf of an employer may be liable for failure to comply with the pre-adverse action notice requirement under an agency theory. Courts confronted with applying agency principles in the context of the FCRA have encountered a host of difficulties. *See, e.g., Kodrick v. Ferguson,* 54 F.Supp.2d 788, 791–94 (N.D.Ill.1999) (discussing issue of whether to apply agency law of state or federal common law of agency to FCRA claims). However, this Court need not address questions concerning an agent's responsibilities under the FCRA, for the undisputed facts on the record show that First Advantage did not take any adverse action against Williams in its capacity as an agent for Rent–A–Center and Winn–Dixie, as discussed in the next section.

**B. Adverse Action**

Williams points to two different types of adverse action performed by First Advantage: (1) the adjudications that resulted in Williams being deemed "ineligible" for employment and (2) the communication of the results of those adjudications (along with the rest of Williams's consumer reports) to Rent–A–Center and Winn–Dixie. ECF No. 71, at 34. Under the facts of this case, neither type of action qualifies as an "ad-

clarity missing from both the statutory text and many judicial constructions of that text—the distinct responsibilities the FCRA places on CRAs and employers/users.

12. This report is available online at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

verse action" within the meaning of the FCRA.

■■■ Simply put, an adjudication cannot *itself* be an adverse action, because it is, in effect, an evaluation that results in a *decision* to take adverse action. An adverse action within the meaning of § 1681b(b)(3)(A) has to be "intended," *see Obabueki,* 145 F.Supp.2d at 392, and a CRA has no intent to do anything adverse to a consumer when it inputs the information it has gathered into an adjudication matrix any more than a teacher has an intent to take an adverse action against a student when she sits down to grade a student's exam.

This is similar in some ways to the situation in *Obabueki.* In that case, the defendant company reached an "internal decision" to withdraw a conditional offer of employment to the plaintiff after determining that he had lied on his employment application. *Obabueki,* 145 F.Supp.2d at 377. (The company realized that he had lied only after receiving the results of a background check. *Id.*) This internal decision was arrived at after a number of employees considered the application and background report and recommended to the decision-maker that the offer be withdrawn. *Id.* Before withdrawing the offer, however, the company sent the plaintiff a notice that it intended to withdraw the offer, and issued him a description of his rights under the FCRA. *Id.* A few days later the company sent the plaintiff a notice that it had withdrawn the offer. *Id.* The plaintiff claimed that the internal deci-

sion was itself an adverse action, and that the notice of intent to withdraw the job offer was thus not issued in a timely manner under § 1681b(b)(3)(A). *Id.* at 391. The court rejected this argument, holding that "an internal decision to rescind an offer is not an adverse action" and that the "plaintiff did not suffer any adverse effect until his offer of conditional employment was withdrawn." *Id.* at 391–92. The court noted that an adverse action within the meaning of § 1681b(b)(3) must be done with intent, and the internal decision-making process was the process by which the company *formed* the intent to take an adverse action. *Id.* at 392.

■■■ The same is true here: the adjudications amounted to decision-making processes, performed by First Advantage pursuant to guidelines established by the employers, by which determinations whether to take adverse action were made; they were not themselves adverse action. Had the employers themselves conducted the adjudications after receiving reports from First Advantage, those adjudications would clearly be "internal decisions" akin to that made in *Obabueki* and would not be adverse action. The fact that they were performed instead by First Advantage using criteria established by the employers does not change the analysis.

Williams also argues that First Advantage took adverse action against him when it communicated the results of the adjudications to his potential employers.[13] There are two problems with this theory.

**13.** First Advantage actually *did* send out pre-adverse action notices on behalf of Rent–A–Center and Winn–Dixie. ECF No. 71–1, at 6, 15. However, because it sent out these notices either at the same time or shortly after it communicated the adjudication results to the employers, it could be in violation of § 1681b(b)(3)(A) if those communications constituted adverse action. *See Brown v.*

*Lowe's Companies, Inc.,* 52 F.Supp.3d 749, 756 (W.D.N.C.2014) (noting that pre-adverse action notices must be sent out "a sufficient amount of time before ... [the] adverse action so that the consumer may rectify any inaccuracies in the report") (quoting *Williams v. Telespectrum, Inc.,* No. 3:05CV853, 2006 WL 7067107, at *5 (E.D.Va. Nov. 7, 2006)).

First, insofar as First Advantage was acting as a CRA when it communicated the results of the adjudications to Rent–A–Center and Winn–Dixie, it could not have violated § 1681b(b)(3)(A) for reasons discussed *supra* Section III.A. Second, insofar as First Advantage was acting as an agent for the employers (and thus was arguably a user) when it sent along the adjudication results, the record reveals that both Rent–A–Center and Winn–Dixie retained ultimate authority to rescind or not make the offers of employment. ECF No. 70–3, at 2; ECF No. 70–8, at 15, 21; ECF No. 70–5, at 3. Under these circumstances, the communication of the results of an adjudication to the employer is, like the adjudication itself, akin to an internal decision or intermediate step in a multistage decision-making process, not an adverse action. This is especially true where, as here, the adjudication results from the application of criteria established *by the employer*; in some sense, the employer has formed the intent to take adverse action through the adjudication process but does not actually know that it has formed that intent until it receives the results of the adjudication. The timing of the pre-adverse action notices in this case—after the adjudications but before the employers actually rescinded their offers of employment—is precisely the timing envisioned by the FCRA.

■■■ An employer could, of course, hold off on issuing pre-adverse action notice—and hold off on forming an intent to take adverse action—until after conducting a review of adjudication results, but it need not do so. It may, as the employers did in this case, rely on a CRA to conduct adjudications pursuant to guidelines it provides the CRA and rely on those adjudications to form an intent to take adverse action. This is because the purpose of the pre-adverse action notice requirement is not to eliminate such rubber stamping by employers, but rather to slow it down and allow consumers time to address any errors in the consumer report before action is actually taken. *See Brown v. Lowe's Companies, Inc.*, 52 F.Supp.3d 749, 756 (W.D.N.C.2014). The presence or absence of any "filtering" on the part of the employer following an adjudication is beside the point—the lack of filtering does not transform the adjudication result or its communication to the employer into an adverse action,[14] but merely ensures that a negative adjudication result will inevitably lead to an *intent* to take an adverse action.[15]

14. In this respect, this Court disagrees with the conclusion reached by the court in *Goode*. To be sure, an adjudication is more likely to lead to an adverse outcome for a consumer if the employer performs no "filtering," but that does not change the fact that the adjudication has no actual effect on a consumer until the employer relies on it to take action. *See Obabueki*, 145 F.Supp.2d at 391–92.

15. It is not improper for an employer to fully intend to carry out the adverse action absent a dispute by the consumer, or even to intend to carry out the adverse action *notwithstanding* the result of any dispute a consumer might initiate. *See Johnson v. ADP Screening & Selection Servs., Inc.*, 768 F.Supp.2d 979, 984 (D.Minn.2011) ("Nothing in the FCRA requires an employer to consider any correction that a reporting agency might make."); *but see Manuel v. Wells Fargo Bank*, No. 3:14cv238, 123 F.Supp.3d 810, 823, 2015 WL 4994538, at 11–12 (E.D.Va. Aug. 19, 2015) (denying summary judgment on issue of whether adverse action occurred because "[a] reasonable jury could find that [the employer's] adverse hiring decision was final" before it ordered pre-adverse action notice sent because the employer "was comfortable adhering to [its] decision [not to hire the consumer] without reviewing it if the individual did not file a dispute"). The FCRA requires an employer to pause and allow a reasonable opportunity for a consumer to dispute the contents of a consumer report, but does not mandate

It is troubling, however, that the status of Williams's application to Rent–A–Center was changed to "rejected" on the same day First Advantage sent its report—which was also the day the pre-adverse action notice was prepared—and that a notation was added the next day indicating that the search was to continue to fill the position for which Williams had applied. ECF No. 46, at 67. This would seem to indicate that, contrary to the claims contained in the pre-adverse action notice, Rent–A–Center had taken adverse action already, or at least that it took adverse action very soon after sending the notice. This could have been a violation of the FCRA, which requires that an employer wait "a sufficient amount of time before ... tak[ing] adverse action so that the consumer may rectify any inaccuracies in the report." *Brown*, 52 F.Supp.3d at 756 (quoting *Williams v. Telespectrum, Inc.*, No. 3:05CV853, 2006 WL 7067107, at *5 (E.D.Va. Nov. 7, 2006)). However, that violation, if it occurred, was Rent–A–Center's violation, not First Advantage's. First Advantage cannot be held liable for Rent–A–Center's failure to wait a sufficient amount of time before taking adverse action, even assuming First Advantage knew that Rent–A–Center would take such action based on the content of its report.

The conclusion that First Advantage did not take adverse action with respect to Williams is not inconsistent with the FCRA's definition of adverse action in § 1681a(k)(1). That definition, while broad, cannot be read in such a way as to include each intermediate decision of what might be a multi-stage decision-making process. *See Obabueki*, 145 F.Supp.2d at 392 n. 31 (noting that "such a [reading] would effectively allow every employee who suffers an adverse employment action following a credit agency report to file an FCRA claim asserting that the decision was made prior to the sending of the intent letter, on the ground that the intent letter reflects that a decision has already been made"). "[I]nternal discussions do not have any adverse impact on a plaintiff and a plaintiff is impacted adversely only when a withdrawal of an employment offer actually occurs." *Javid v. SOS Intern., Ltd.*, No. 1:12cv1218, 2013 WL 2286046, at *4 (E.D.Va. May 23, 2013) (citing *Obabueki*, 145 F.Supp.2d at 391–92). And while Williams is correct that *Obabueki* did not address the "catch-all" portion of the FCRA definition of "adverse action,"[16] that does not help his case: it is difficult to see how the language of the catch-all provision expands in any meaningful way the already broad scope of the employment-specific definition of adverse action in § 1681a(k)(1)(B)(ii),[17] and it is questionable whether the catch-all provision even applies in the employment context.[18] At any

---

that the employer act decently with respect to the results of any such dispute.

**16.** The catch-all provision states that an adverse action includes any "action taken or determination that is ... made in connection with an application that was made by, or a transaction that was initiated by, any consumer ... and [that is] adverse to the interests of the consumer." 15 U.S.C. § 1681a(k)(1)(B)(iv).

**17.** The employment-specific portion of the FCRA's definition of adverse action provides

that "[t]he term 'adverse action' ... means ... a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee." 15 U.S.C. § 1681a(k)(1)(B)(ii).

**18.** Some courts have held that the catch-all provision does apply to employment-related actions. *See, e.g., Goode*, 848 F.Supp.2d at 540–42. While this Court has serious doubts about that holding, it is not necessary to address that question because the actions in this case were not "adverse actions" even under the catch-all provision.

rate, the basic idea of *Obabueki*—that internal decisions or the communication of those decisions internally cannot be adverse actions because they do not actually affect the consumer—applies with equal force to the catch-all provision. If that provision does expand the meaning of adverse action in the employment context, it does not expand it to reach internal decisions or the communication of internal decisions.[19]

This Court is not insensitive to the practical difficulties facing both the employers and Williams during the periods in which Williams was disputing the contents of his background reports. The reinvestigation of the Rent–A–Center report took almost two weeks; the reinvestigation of the Winn–Dixie report took over three weeks. To ask an employer to wait that long before moving on to other applicants— before taking adverse action—is unreasonable. And yet that appears to be precisely what the FCRA contemplates, as it allows CRAs 30 days to conduct reinvestigations in most instances. 15 U.S.C. § 1681i(a)(1). The solution to this difficulty, however, is not to interpret the FCRA to impose obligations on CRAs that are properly imposed on employers. The FCRA already imposes many obligations on CRAs—such as the obligation to maintain reasonable procedures to assure maximum possible accuracy of reported information—and when a CRA fails to fulfill those obligations it may be held liable under the proper provision. Section 1681b(b)(3)(A), much like § 1681i(a)(5), is not the proper provision in this case, and so First Advantage is entitled to summary judgment on Count III of Williams's Second Amended Complaint.

## IV. PUBLIC RECORD INFORMATION CLAIM (COUNT IV)

First Advantage seeks summary judgment on Williams's claim that it failed to comply with 15 U.S.C. § 1681k(a). That section requires a CRA that "furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment" to either (1) notify the consumer that such information is being reported "at the time" it is reported or (2) "maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date."

The parties disagree about whether Williams must show that First Advantage both failed to provide notice *and* failed to maintain strict procedures, or whether showing just one suffices. ECF No. 70, at 20; ECF No. 73, at 37. The statutory text here is clear: First Advantage was only required to *either* provide notice *or* maintain strict procedures, and so Williams must show that First Advantage did neither in order to prove that it violated the statute.

### A. Notice

■ The parties dispute whether First Advantage "notified" Williams that it was reporting information about criminal records "at the time" it reported such information to Winn–Dixie and Rent–A–Center, disagreeing as to both the legal meaning of the phrase "at the time" and the facts in the record. ECF No. 70, at 19–20; ECF No. 73, at 38–41. The legal disagreement concerns whether sending public record

19. Insofar as First Advantage acted as an agent for the employers in communicating adjudication results, those communications were "internal" for purposes of this analysis.

information to an employer via electronic means while sending out notice to a consumer on the same day via U.S. Mail constitutes sending timely notice. It is not necessary at this time to resolve this legal question, however, because there exists a disputed issue of material fact: Williams claims that the notices were postmarked two and four days after the records were sent to the employers electronically, ECF No. 73, at 39; First Advantage claims it sent the notices at the time it sent the records to the employers, and that it "did not control the delivery of the mail," ECF No. 72, at 20–21. A reasonable jury could find that the notices were sent out days after the employers were notified electronically—clearly a violation of § 1681k(a)(1) under any construction of "at the time." Williams may thus prevail on showing that First Advantage failed to comply with § 1681k(a)(1), and it is necessary to consider § 1681k(a)(2).

## B. Strict Procedures

■ First Advantage argues that in order to show a violation of § 1681k(a)(2), Williams must show *both* (1) that some public record information reported by First Advantage was incomplete or out of date *and* (2) that First Advantage failed to maintain strict procedures to ensure completeness and freshness. ECF No. 70, at 20. Although only the second requirement is found in the text of section 1681k(a)(2), multiple courts have construed the provision as containing an implicit requirement that a CRA must have reported items of public information about the plaintiff that were incomplete or not up to date for the plaintiff to state a claim. *See, e.g., Farmer v. Phillips Agency, Inc.,* 285 F.R.D. 688, 695–700 (N.D.Ga.2012); *cf. Cahlin v. Gen. Motors Acceptance Corp.,* 936 F.2d 1151, 1156 (11th Cir.1991) (holding that in order to state a claim for a violation of the similarly-worded § 1681e(b), a plaintiff

must show that the CRA *actually* reported inaccurate information *and* that it failed to follow reasonable procedures). The reasoning of these courts is sound and there is no need to revisit it here; this Court finds that Williams must show both (1) that First Advantage reported public record information likely to have an adverse effect on his ability to obtain employment, and that that information was either not complete or not up to date; and (2) that First Advantage failed to maintain strict procedures to ensure that such public record information would be complete and up to date.

### 1. Actual Completeness

Unsurprisingly, the parties disagree about the meaning of "complete and up to date." Williams argues that the accuracy of the information contained in First Advantage's reports to Rent–A–Center and Winn–Dixie is relevant to the § 1681k(a)(2) analysis. ECF No. 73, at 41–43. First Advantage disagrees, arguing that the information doesn't need to be *accurate,* but needs to be up to date and complete—that is, the reported information cannot omit key features found in the original public record, and must reflect the current status of the public record. ECF No. 72, at 22–23.

First Advantage's argument appears at first glance to have more force. Section 1681k(a)(2) uses the phrase "complete and up to date" to describe the requirements that reported public record information must meet—certainly if Congress had meant "accurate" it could have used that term, as it did in section 1681e(b). And, as First Advantage points out, there is evidence that the evil sought to be addressed by § 1681k(a)(2) was the reporting of stale and/or incomplete public record information, not the reporting of public record information unrelated to the subject of the

report. ECF No. 70, at 22 n.2. Finally, at least one court has noted that "it is not apparent that [section] 1681k(a)(2) actually imposes an accuracy requirement at all" because "[c]ompleteness, up to dateness, and accuracy are not necessarily synonymous." *Farmer*, 285 F.R.D. at 699 n. 18.

On the other hand, Williams cites to a few cases that have treated the § 1681k(a)(2) "strict procedures" requirement as simply a more demanding version of the § 1681e(b) "reasonable procedures" requirement, effectively treating "complete and up to date" and "accurate" as the same thing. *See, e.g., Smith v. HireRight Sols., Inc.*, 711 F.Supp.2d 426, 439 (E.D.Pa.2010) ("given the Court's findings as to the 'reasonableness' of Defendant's procedures, we are precluded from making any conclusions as to whether Defendant followed strict procedures"). While these cases have not dealt with the difference in language head-on, perhaps they nonetheless came to the right conclusion; given that the "consumer oriented objectives [of the FCRA] support a liberal construction" of the statute, *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir.1995), perhaps the requirement that a CRA report "complete and up to date" information on a consumer necessarily includes a requirement that the information actually be about that consumer.

Furthermore, Williams points out that First Advantage included part of his Social Security number in the portions of its report to Rent–A–Center that included Ricky 1's criminal records, ECF No. 73, at 46; ECF No. 71–11, at 6, raising the question of whether public record information that includes "extra" bits of information not found in the original public record is "complete and up to date."

■■■ Neither party has shown that it is entitled to judgment as a matter of law, and even in the absence of a factual dis-pute this particular issue is not fit for resolution at the summary judgment stage. *See Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir.2001) ("even in the absence of a factual dispute, a district court has the power to deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial") (quotations and citations omitted).

### 2. Adequacy of Procedures

■■■ For much the same reason that the question of "reasonableness" of procedures under § 1681e(b) is "a jury question in the overwhelming majority of cases," *Cahlin*, 936 F.2d at 1156, the question of whether First Advantage employed strict procedures to ensure that reported public record information would be complete and up to date is a jury question.

### C. Willfulness

■■■ Because Williams's § 1681k claim survives, it is necessary to address First Advantage's summary judgment motion as to the question of "willfulness." For Williams to prove that First Advantage "willfully fail[ed] to comply with any requirement imposed" by the FCRA, he must show that First Advantage acted with (at least) reckless disregard for its duties under the statute. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56–57, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007). That is, he must show that First Advantage's conduct was "not only a violation under a reasonable reading of the statute's terms, but [also] that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69, 127 S.Ct. 2201. If First Advantage complied with an objectively reasonable—albeit incorrect—construction of the statute, it cannot be said to have willfully violated the law.

See id. In determining whether a particular construction of the statute is objectively reasonable, it is necessary to consider the text of the FCRA and any "guidance from the courts of appeals or the Federal Trade Commission that might have warned [a CRA] away from the view it took." See Levine v. World Fin. Network Nat'l Bank, 554 F.3d 1314, 1318 (11th Cir. 2009) (citing Safeco, 551 U.S. at 69–70, 127 S.Ct. 2201).

Given the uncertainty in what "complete and up to date" means, the construction of § 1681k(a)(2) urged by First Advantage is not objectively unreasonable. Under that reading, the only possible violation [20] committed by First Advantage was the inclusion of Williams's Social Security number along with the criminal records for Ricky 1 in its report to Rent–A–Center—a violation whose severity is mitigated by the fact that First Advantage did note in the report that the match with the criminal records had been made using name and date of birth, not Social Security number. ECF No. 73–13, at 6. Furthermore, the record establishes that First Advantage did have a procedure in place to ensure that reported criminal records were complete and up to date as it understands those terms. ECF No. 70–2, at 14; ECF No. 70–4, at 8–9; ECF No. 70–3, at 3. Given the scant guidance available to First Advantage concerning the contours of § 1681k(a)(2) and its procedures for ensuring what it reasonably could have thought constituted "complete and up to date" information, it would be unreasonable to find that First Advantage willfully violated § 1681k(a)(2).[21]

## V. REASONABLE PROCEDURES CLAIM (COUNT I)

First Advantage does not seek summary judgment on Williams's "reasonable procedures to assure maximum possible accuracy" claim brought under 15 U.S.C. § 1681e(b). Williams does seek summary judgment on this claim, however, arguing that this represents an "exceptional case" in which it would be appropriate to deem a CRA's procedures "unreasonable as a matter of law." ECF No. 71, at 30. First Advantage disagrees, pointing to (among other things) its expert witness's conclusion that First Advantage's error rate is many times less than the industry standard. ECF No. 72, at 7.

The nature of the battle waged between the parties in their summary judgment papers demonstrates why the question of whether a CRA followed "reasonable procedures to assure maximum possible accuracy" is "a jury question in the overwhelming majority of cases." Cahlin, 936 F.3d at 1156. This case is a member of that overwhelming majority. Williams has identified a number of shortcomings in First Advantage's procedures,

---

20. This Court is not considering Williams's claim—advanced in filings submitted subsequent to the parties' summary judgment papers—that in compiling its Winn–Dixie report First Advantage reviewed an FDOC website that indicated that Ricky 2 was in jail at the time, but failed to note this information in its report to Winn–Dixie. ECF No. 120. It is conceivable that this claim, if true, could constitute a failure to report a "complete and up to date" record in violation of § 1681k(a), but the facts concerning that claim are not before this Court at this time.

21. Of course, much of this conclusion stems from the dearth of case law and other forms of guidance that might shed light on what "complete and up to date" means. In contrast, "reasonable procedures to assure accuracy" has been fleshed out by numerous appellate courts, including the Eleventh Circuit Court of Appeals. See, e.g., Cahlin, 936 F.2d 1151.

including its use of only two identifiers (name and date of birth) to match records for consumers with common names. ECF No. 71, at 25–26. First Advantage has provided evidence that its procedures are generally acceptable in its industry and result in a relatively low number of errors. ECF No. 72, at 7; ECF No. 72–2; ECF No. 72–3. A jury must weigh this information and decide whether First Advantage's process represents that of a "reasonably prudent person under the circumstances." *See Davis v. Equifax Info. Servs. LLC,* 346 F.Supp.2d 1164, 1171 (N.D.Ala.2004). Williams is thus not entitled to summary judgment on Count I of his Second Amended Complaint.

## CONCLUSION

Williams's claims that First Advantage violated § 1681b(b)(3)(A) and § 1681i(a)(5)(B) fail as a matter of law, and so First Advantage's Motion for Summary Judgment will be granted as to those two claims. Williams's claims based on violations of § 1681e(b) and § 1681k(a) will be tried by a jury.

For these reasons,

**IT IS ORDERED:**

1. Insofar as Plaintiff brings a claim for a negligent violation of the FCRA in Count IV of his Second Amended Complaint, Defendant's Motion for Summary Judgment, ECF No. 69, is **DENIED** as to that count. Defendant's Motion for Summary Judgment, ECF No. 69, is **GRANTED** as to Counts II and III of the Second Amended Complaint and Count IV insofar as it states a claim for a willful violation of the FCRA.

2. Plaintiff's Motion for Summary Judgment, ECF No. 71, is **DENIED.**

3. The Clerk must set a telephonic hearing for no later than Friday, October 23, 2015, the purpose of which hearing will be to set a trial date.

**SO ORDERED on October 14, 2015.**